UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JAMES PRETTY,

        Plaintiff,

v.                                       Case No. 1:04-CV-535

AMERICAN AXLE AND                    HON. GORDON J .QUIST
MANUFACTURING HOLDINGS, INC.,

        Defendant.

_____/

## OPINION

      Plaintiff, James Pretty ("Pretty"), has sued Defendant, American Axle And Manufacturing Holdings, Inc. (AAM), alleging that AAM terminated his employment in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 et seq. Pretty also alleges that by discharging him AAM retaliated against him for asserting his rights under the FMLA. AAM has moved for summary judgment. AAM's motion will be granted.

## I. Facts

      Pretty was a former AAM employee who worked in the Three Rivers branch as a Senior Manufacturing Technician. Pretty was a member of a collective bargaining unit represented by the United Auto Workers ("UAW"). He was terminated on June 10, 2002, effective June 7, 2002. Pretty's last day of actual work was May 17, 2002.

      On May 24, 2002, Pretty allegedly obtained a note from Dr. K. Nandihalli, M.D., which states: "Unable to work from 5-18-02 till 6-3-02." From May 20 to May 30, 2002, Pretty telephoned the security guards at AAM eight times and informed the guards that he was sick. Pretty did not

describe the nature of his illness.[1]  On May 31, 2002, Ron Markan, the Three Rivers Manager of

Labor Relations, became concerned that Pretty had been absent for two weeks but had not applied

for sickness and accident (S&A) benefits under the collective bargaining agreement ("CBA").  As

a business practice when employees call in "sick" for extended periods without requesting S&A

benefits, Markan sends a so-called Paragraph 64(d) letter (the "64(d) letter").

Paragraph 64(d) of the CBA between AAM and the UAW provides:

> (64) Seniority shall be broken for the following reasons:
>
> . . .
>
> (d) If the associate fails to return to work within five (5) working days after being notified to report for work, and does not give a satisfactory reason.  Such notice shall be clear in intent and purpose.  A copy of Management's notification of such loss of seniority will be furnished promptly to the Chairperson of the Shop Committee.

(Def.'s Br. Supp. Mot. Ex. 11 at 44.)  Markan testified that "loss of seniority" in Paragraph 64(d)

means termination of employment.  Markan sent the 64(d) letter to Pretty on May 31, 2002, which

reads as follows:

> In accordance with Paragraph 64(D) of the AAM-UAW National Agreement, you are hereby instructed to report for work.  Failure to report for work in accordance with this notice within five (5) working days after delivery or attempted delivery of this notice at your last know [sic] address as shown on company records, whichever is first, may result in the loss of your seniority.

(Def.'s Br. Supp. Mot. Ex. 10.)  Neither party has provided any evidence to show exactly when

Pretty received the letter, but it is undisputed that Pretty received the letter.  Pretty never returned

to work after receiving the letter, and he was terminated on June 10, 2002.

---

[1] It is unclear whether Pretty talked to the same or different security guards in these eight phone calls.  The security guards are not employees of AAM.  However, as Pretty alleges, the guards act as a liaison between the employees and AAM.  Pretty testified that employees report any leave of absence to the guards.  Doug Edwards, Pretty's supervisor, testified that he received attendance information from security guards every day.

AAM argues that Pretty was terminated because he did not comply with Paragraph 64(d) (i.e. Pretty never returned to work or contacted the company to explain his absence after he received the letter). However, Pretty contends that, after May 31, he had a conversation with (1) his "advisor" at AAM, Doug Edwards, who became Pretty's supervisor during his third week of absence; and (2) his union representative. But Pretty concedes that he is not sure whether the union representative later conveyed the information to AAM. On the other hand, Edwards testified that he never talked to Pretty during his absence regarding his nature of alleged illness.

The Court must accept Pretty's version that he did talk with Edwards after receipt of the 64(d) letter. However, even Pretty admitted that he could not remember what he told Edwards:

Q:      So he [Edwards] called you on a personal level?

A:      Yeah.

Q:      What did you tell him?

A:      Basically the things I had been going through and, you know.

Q:      I need to know specifically.

A:      I can't give you specifics. I would be speculating to give you the specifics.

Q:      So you can't recall the specifics of your conversation with Doug Edwards other than to say that he called up as a friend just to see how you were?

A:      Right.

Q:      You can't remember anything else about that conversation?

A:      No.

(Pretty Dep. at 102, Def.'s Br. Supp. Mot. Ex. 1.)

Pretty claims he presented a doctor's note to AAM and the note excused him from work. Pretty has not specified which day he presented the note to AAM (i.e. before or after his

termination).  AAM claims that it did not receive the note until after it deposed Pretty.  The doctor's note was dated May 24 and states: "Unable to work from 5-18-02 till 6-3-02."

AAM argues that Pretty was not entitled to take a leave under the FMLA because he provided no excuse for his absence from June 3 to June 7.  AAM argues that Pretty was terminated, not because he was absent from May 20 to June 3; rather, he was terminated because he failed to comply with Paragraph 64(d) and was not entitled to FMLA leave after June 2.  AAM argues that Pretty has offered no evidence to show that he was terminated due to his absence from May 20 to May 30.

In August 2002, the union and AAM negotiated a buy out for Pretty.  Pretty received $29,997.54 as a result of his grievance but did not sign a release of all claims.  Paragraph 53 of the CBA provides that "[t]he disposition or settlement, by and between the Corporation and the Union, of any grievance or other matter, shall constitute a full and complete settlement thereof and shall be final and binding upon the Union and its members, the associate or associates involved and the Corporation."  (Def.'s Br. Supp. Mot. Ex. 11 at 34.)  AAM, however, does not argue that Pretty released it from all claims.

## II.  Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  Material facts are facts which are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992)

4

(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III.  Discussion

### A.    The Law

The FMLA entitles qualifying employees to take up to twelve weeks of unpaid leave within a 12-month period if an employee suffers from "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  The term "serious health condition" signifies "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).

> [I]n order to show that he or she was "required" to miss work for more than three days, a plaintiff employee must show that he or she was prevented from working because of the injury or illness based on a medical provider's assessment of the claimed condition.  It does not mean that, in the employee's own judgment, he or she should not work, or even that it was uncomfortable or inconvenient for the employee to have to work.  Rather, it means that a "health care provider" has determined that, in his or her professional medical judgment, the employee cannot work (or could not have worked) because of the illness.

*Olsen v. Ohio Edison Co.*, 979 F. Supp. 1159, 1166 (N.D. Ohio 1997).  *See also Brannon v. Osh Kosh B'Gosh, Inc.*, 897 F. Supp. 1028, 1035 (M.D. Tenn. 1995) (plaintiff's illness does not constitute serious health conditions where her doctor did not advise her to refrain from work and could not testify that her illness prevented her from performing the functions of her job.).

An employee seeking FMLA leave is obligated, during his employment, to give his employer a notice sufficient to alert the employer that the leave is a FMLA-qualifying leave.  29 U.S.C. § 2612(e).  However, the employee "does not have to expressly assert his right to take leave as a right

under the FMLA." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999). The

Department of Labor regulations provide:

> (c) An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed for an expected birth or adoption, for example. The employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken. In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave.

29 C.F.R. § 825.302. As stated in *Brenneman v. Medcentral Health System*, 366 F.3d 412, 421 (6th

Cir. 2004):

> Rather, the critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job.

Pursuant to the FMLA, it is unlawful "for any employer to interfere with, restrain, or deny

the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. §

2615(a)(1).

The Sixth Circuit recognizes "two distinct theories for recovery under the FMLA: (1) the

'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation'

or 'discrimination' theory arising from 29 U.S.C. §2615(a)(2)." *Hoge v. Honda of Am. Mfg., Inc.*,

384 F.3d 238, 244 (6th Cir. 2004). "The 'entitlement' or 'interference' theory is derived from the

FMLA's creation of substantive rights. If an employer interferes with the FMLA-created right to

medical leave or to reinstatement following the leave, a violation has occurred." *Arban v. West*

*Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). On the other hand, the "retaliation" theory

prohibits an employer from discharging an employee for exercising his rights under FMLA.  In the instant case, Pretty alleges both an entitlement and a retaliation claim.

**B.      The Entitlement Claim**

The Court concludes that AAM properly terminated Pretty because he failed to comply with Paragraph 64(d) for his absence.  First, Pretty was absent from work from May 20 to June 10, 2002, the day of his termination.  His doctor's note excused him from work only from May 20 to June 2. Pretty has not provided any evidence to establish that he had a serious health condition and was unable to work from June 3 to June 7.  Therefore, Pretty is not entitled to FMLA leave for his absence from June 3 to June 7.

Second, sufficient evidence shows that Pretty was terminated not because of his absence from May 20 to May 31, but because of his absence from June 3 to June 7.  The 64(d) letter sent to Pretty on May 31 instructs Pretty to report for work within five working days or risk being terminated. Pretty did not report to work as instructed and provided no FMLA excuse.  Indeed, by June 2, Pretty was cleared for work by Dr. Nandihalli.  The termination letter dated June 10 states that Pretty was terminated effective as of June 7 because he failed to comply with Paragraph 64(d).  (Def.'s Br. Supp. Mot. Ex. 13.)  Moreover, AAM's internal document regarding Pretty's termination indicates that he was terminated because he failed to report to work on June 7.  Furthermore, Pretty has not provided any evidence to establish that he was terminated because of his absence from May 20 to May 31.  Because Pretty did not report to AAM or provide a satisfactory reason for his absence after he received the letter, AAM properly terminated Pretty pursuant to Paragraph 64(d).

Pretty argues that his conversation with Edwards sometime after he received the 64(d) letter was sufficient to inform AAM that he was on FMLA leave.  Pretty relies upon *Cavin v. Honda of America Manufacturing, Inc.*, 346 F.3d 713 (6th Cir. 2003).  However, the facts in *Cavin* were

7

different, and Pretty misinterprets the law. *Cavin* does not hold that calling-in sick is a sufficient notice of a need for FMLA leave. The first issue that *Cavin* addresses is whether the employee provided sufficient notice to apprise his employer of his need for FMLA leave. Unlike the case at issue, Cavin called in and did not state that he was sick. Rather, he informed the security guard that he was injured in a motorcycle accident and just got out of the hospital.

> Cavin specifically informed Honda (1) that he had been at the hospital, and (2) that he was unable to work due to his injury. Thus Cavin did not merely state that he was involved in a motorcycle accident, but rather provided additional information about his treatment and condition–he told Honda that he was unable to perform his job because of his injury.

*Cavin*, 346 F.3d at 725. The second issue that *Cavin* addresses is whether an employer may deny an employee's FMLA leave because he failed to comply with the internal procedural requirements that are more stringent than those contemplated by the FMLA. The court held that the employer cannot deny FMLA leave on the ground that the employee failed to comply with internal procedures, as long as he gives timely verbal notice of his need for leave. *Id.* at 722.

Unlike *Cavin*, in the instant case the issue presented is whether the notice provided by the employee is sufficient if the employee does not inform the employer of the nature of the illness. Therefore, this case is governed by *Brenneman v. Medcentral Health System*, 366 F.3d 412 (6th Cir. 2004). In *Brenneman*, an employee called his employer and said that he was not doing well and would not be in that day. He did not mention that his absence was in any way related to his diabetic condition. The court held that the employee's reason for his absence did not give the employer sufficient notice for a FMLA leave.

> [P]laintiff did not advise defendant that his March 31st absence was related to a serious health condition–here, diabetes. Moreover, plaintiff's bare statement that he was unwell would not have reasonably apprised defendant that his absence was FMLA-qualifying, given plaintiff's long history of diverse physical maladies, both work-related and non-work-related. Likewise, plaintiff's assertion that he would

8

habitually state only that he was "ill" or "not feeling well" when he was experiencing a diabetes-related illness is unpersuasive. Thus, even if plaintiff's assertions were true–that defendant knew of plaintiff's diabetes and his past need for FMLA leave for diabetes-related absences–, they are insufficient to create a genuine issue of material fact as to whether plaintiff's "call-in" gave defendant sufficient notice that his March 31st absence was FMLA-qualifying.

*Id.*, 366 F.3d at 423-24 n.9.  *See also Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999) (holding the fact that an employee merely notified his employer that he is sick, without more, is an insufficient notice to invoke the FMLA; rather, the employee must notify the employer that he is suffering from a serious health condition that prevents him from performing his job).

Finally, of course, to be entitled to FMLA leave, the employee must be either in the hospital or under continuous care of a medical provider.  29 C.F.R. § 825.114.  In the instant case, Pretty was neither in the hospital nor under continuous care of his doctor.  He visited his doctor only once, on May 24, for the symptoms related to his absence.  He did not visit that doctor again until sometime in the fall.  Pretty testified that he was taking Xanax for a couple weeks, but he did not remember whether he received any prescription as a result of his visit.  And even his own physician cleared Pretty for work as of June 3.  Such evidence cannot establish that Pretty was under continuous treatment by his doctor.  And it negates that Pretty was entitled to FMLA leave after June 2.

## C.    The Retaliation Claim

To establish a prima facie case of retaliation, Pretty must show (1) that he notified AAM of his intent to take an FMLA leave; (2) that he suffered an adverse action; and (3) that there is a causal connection between the notice of the need for FMLA leave and the adverse action.  *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).  Pretty's retaliation claim fails because he never informed AAM of his intent to take FMLA leave.  Moreover, Pretty cannot show that AAM

terminated him because he took alleged FMLA leave from June 3 to June 7.  As a result, Pretty can

not establish a prima facie case that he was retaliated against for exercising his FMLA rights.


Dated:  June 17, 2005                                              /s/ Gordon J. Quist
                                                              GORDON J. QUIST
                                                  UNITED STATES DISTRICT JUDGE